RENDERED: JULY 10, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-1269-MR

LONDON CITY COUNCIL;
ANTHONY ORTEGA; DONNA GAIL
WILSON HOUSE; JAMES BAKER;
JUDD WEAVER; JUSTIN YOUNG;
KELLY SMITH GREENE; MAYOR
TRACIE HANDLEY; AND THE CITY
OF LONDON, KENTUCKY                                           APPELLANTS


                        APPEAL FROM LAUREL CIRCUIT COURT
v.                HONORABLE DAVID WILLIAMS, SPECIAL JUDGE
                        ACTION NO. 25-CI-00864


RANDALL WEDDLE                                                    APPELLEE


                                OPINION
                        REVERSING AND REMANDING

                        ** ** ** ** **

BEFORE: CALDWELL, ECKERLE, AND TAYLOR, JUDGES.

CALDWELL, JUDGE: This appeal challenges the Laurel Circuit Court's

overturning the London City Council's removal of Randall Weddle ("Weddle") as

mayor and the court's reinstatement of Weddle to office. For the reasons set forth

herein, we reverse the circuit court's judgment and remand with directions to

immediately vacate Weddle's reinstatement and to enter an order affirming the London City Council's removal of Weddle from office.

**FACTS**

Weddle was elected Mayor of London, Kentucky in November 2022.

In early July 2025, Weddle presided over a regular meeting of the London City Council ("the city council"). During this meeting, Chris Robinson ("Robinson") of the City of London Tourism and Convention Commission ("the tourism commission") spoke to the city council about efforts to rebuild structures at the local fairgrounds following a recent tornado.

Robinson indicated some insurance claims were still pending and mentioned plans to take out a loan for five million dollars for rebuilding the fairgrounds. He also stated that the mayor would sign loan documents because city property would be affected. Council members asked some questions about the loan, including asking if loan documents were available for review. Robinson replied he did not have the documents with him. Robinson's presentation ended without any motion being made or vote taken by the city council.

The day after this early July city council meeting, Weddle signed documents to mortgage city property, including the Levi Jackson Wilderness Road Park ("the park"), to secure a loan of five million dollars. These documents included a Loan Agreement between the tourism commission as borrower, the City

of London as mortgagor, and a bank as the lender. The Loan Agreement provided for the tourism commission to borrow five million dollars and to make payments on the loan for approximately thirty years. The Loan Agreement also stated the loan would be secured by a mortgage on city property including the park. Weddle also signed the mortgage on city property along with an assignment of rents and leases on such property. (Weddle did not sign the promissory note, however, which was executed by representatives of the bank and the tourism commission.)

In August 2025, the city council issued resolutions charging Weddle with misconduct. (The charges issued were civil in nature and did not initiate criminal prosecution.)

A public hearing on the misconduct charges occurred on September 5, 2025. At the end of this hearing, the city council voted unanimously to remove Weddle from office on three bases, including Weddle's execution of the loan documents and mortgage on city property without first obtaining city council approval.[1]

On September 11, 2025, Weddle filed an appeal from his removal with the circuit court. He named as opposing parties the City of London, the city council, acting mayor Tracie Handley ("Handley"), and individual city council

---

[1] The city council also unanimously voted to remove Weddle on two other bases related to alleged failures to timely publish ordinances and to timely fill Ethics Board vacancies.

members (collectively, "the London parties"). Weddle also filed a motion for an expedited briefing schedule and for a temporary injunction.

On September 17, 2025, the circuit court conducted a hearing on the motion for a temporary injunction. On September 24, 2025, the court entered an order granting the motion for an expedited briefing schedule and denying the motion for a temporary injunction.

Also, on September 24, 2025, the London parties filed a partial motion to dismiss and an answer. These filings asserted, *inter alia*, that Handley and the City of London were not properly served notice of the action and/or were not properly served with process because they were served by the acting chief of police instead of the sheriff.

On September 29, 2025, the circuit court conducted a hearing on Weddle's appeal. On this same date, the court also entered a terse written order concluding that the city council failed to present sufficient grounds for removing Weddle from office and immediately reinstating Weddle as mayor.[2]

---

[2] The order entered September 29, 2025, also stated that any objections to service of process had been waived by the London parties' making a general appearance. Because we reverse the circuit court's overturning Weddle's removal on the merits, we decline to address the alternative argument that Weddle's circuit court challenge to his removal should have been dismissed based on lack of proper service of process. Moreover, we note our Supreme Court concluded that there was substantial compliance with statutory requirements for serving notice and rejected the argument about lack of proper service of process in its Opinion and Order Denying Interlocutory Relief. *London City Council v. Weddle*, No. 2025-SC-0462-I, 2025 WL 3768494, at *4 (Ky. Dec. 18, 2025) (unpublished).

The London parties (hereinafter "Appellants") filed a timely appeal from the circuit court's overturning Weddle's removal and reinstatement of him to office. Further facts will be provided as necessary in our analysis.

## ANALYSIS

### Standard of Review

Appellants argue the circuit court erred in determining the city council failed to present sufficient grounds for Weddle's removal. So, Appellants essentially challenge the circuit court's resolution of questions of law including the sufficiency of the stated grounds for removal in light of applicable legal authority. Thus, since purely or primarily legal issues are involved, we review the circuit court's conclusion that sufficient grounds for Weddle's removal did not exist *de novo*—meaning without deference. *See, e.g.*, *Seeger v. Lanham*, 542 S.W.3d 286, 290 (Ky. 2018) (questions of law, such as statutory interpretation, are reviewed *de novo*); *Wheeler v. City of Pioneer Village*, 723 S.W.3d 764, 771 (Ky. 2025) (statutory interpretation is a question of law to be reviewed *de novo*).[3]

---

[3] *See also generally Arnett v. City of Stanton*, No. 2007-CA-000266-MR, 2008 WL 4091014, at *3 (Ky. App. Sep. 5, 2008) (unpublished) (appeal from circuit court order affirming city council's decision to remove mayor, and stating the issues raised by the mayor—alleged lack of due process and the city council's allegedly acting from improper political motives and failing to comply with Open Meetings laws—were questions of law subject to *de novo* standard of review).

This unpublished opinion is not binding authority pursuant to Kentucky Rules of Appellate Procedure ("RAP") 40(D) and RAP 41(A), but we may consider it as persuasive authority. *See, e.g.*, *Ford Motor Company v. Badall*, 707 S.W.3d 10, 17 n.4 (Ky. App. 2025).

Next, we turn our attention to the requirements for removal of an elected city officer.

KRS[4] 83A.040(9)[5] addresses, in situations such as the one at hand, removals of elected city officials for alleged misconduct, incapacity, or willful neglect of duties. KRS 83A.040(9) states:

> Except in cities of the first class,[6] any elected officer, in case of misconduct, incapacity, or willful neglect in the performance of the duties of his or her office, may be removed from office by a unanimous vote of the members of the legislative body exclusive of any member to be removed, who shall not vote in the deliberation of his or her removal. No elected officer shall be removed without having been given the right to a full public hearing. The officer, if removed, shall have the right to appeal to the Circuit Court of the county and the appeal shall be on the record. No officer so removed

---

For future reference, we remind the parties' attorneys of RAP 41(A)(4)'s requirement that, when citing unpublished opinions for our consideration, one must clearly state that such unpublished opinions are not binding authority.

[4] Kentucky Revised Statutes.

[5] Another subsection of KRS 83A.040 was amended in 2026; however, subsection 9 of KRS 83A.040 was not amended. All references to KRS 83A.040 in this Opinion are to the version of this statute in effect at the time of the 2025 removal proceedings and appeal to the circuit court.

Weddle argued to the circuit court that KRS 83A.040 was unconstitutional. The circuit court's written order did not explicitly reach whether KRS 83A.040 was unconstitutional, although the judge orally stated at the hearing that he believed the statute was constitutional. In sum, the circuit court did not rule that KRS 83A.040 was unconstitutional. Moreover, Weddle did not file a cross-appeal to challenge KRS 83A.040's constitutionality so we need not address any issues about the constitutionality of this statute.

[6] No one disputes that London is not a city of the first class as defined by Kentucky law.

shall be eligible to fill the office vacated before the expiration of the term to which originally elected.

Appellants contend Weddle was properly removed for misconduct or willful neglect. They argue Weddle's signing the mortgage pledging city property as collateral and other loan-related documents without prior city council approval violates various statutory or constitutional provisions. *See, e.g.*, KRS 91A.030(13); KRS 91A.390(7); KY. CONST.[7] § 157b. Appellants also contend that precedent indicates the term *misconduct* should be broadly construed to include violations of the law and financial irregularities. *See generally Jenkins v. Keith*, 285 Ky. 240, 147 S.W.2d 397 (1941); *State Bd. for Elementary and Secondary Educ. v. Ball*, 847 S.W.2d 743 (Ky. 1993); *Rawlings v. City of Newport*, 275 Ky. 183, 121 S.W.2d 10 (1938).[8] Thus, Appellants assert the circuit court erred in overturning Weddle's removal for lack of sufficient grounds.[9]

---

[7] Constitution of Kentucky.

[8] *See also generally Arnett*, 2008 WL 4091014, at *2-4 (although focusing on proof of sexual harassment in upholding removal of mayor especially since contract-related issues arose in mayor's prior administration, noting indications of "financial irregularities" including mayor's approving payments to contractors which were not authorized by the city council, and mayor's paying a contractor who had not been awarded a contract by the city council).

[9] Long-standing precedent generally indicates that when a court reviews a city officer's removal for misconduct, the removal must not be arbitrary or capricious, but instead must be supported by substantial evidence and legally sufficient cause to be upheld in court. *See generally Rawlings*, 121 S.W.2d at 15-16 (1938). No one has specifically disputed that this principle should apply here despite *Rawlings* being distinguishable from this case in certain respects.

*Rawlings* involved the removal of a city manager (not a mayor) pursuant to a then-applicable "City Manager Act" which called for public removal hearings, but which did not

-7-

In contrast to Appellants, Weddle argues the circuit court was correct in concluding there were not sufficient grounds for his removal. He asserts he did not engage in misconduct or willful neglect by executing documents at the tourism commission's request after "presenting the issue" to the city council. (Appellee brief, page 10.)

The city council charged Weddle with misconduct for signing loan documents, including a mortgage on city property, without first obtaining the city council's approval. The city council emphasizes on appeal that no motion was made, and no vote was taken following Robinson's discussion of loan and mortgage-related matters at the July 7, 2025, meeting. Weddle asserts, however, that he was fully transparent about the loan transaction. He also suggests the city council effectively approved the loan transaction and mortgage by not raising objections after Robinson's discussion of the loan.[10]

---

explicitly provide for an appeal in court. *Id*. at 13-15. Moreover, in conformity with this City Manager Act, Rawlings had not been elected in a citywide election but was instead "elected" by the mayor and two of the four members of the board of commissioners. *Id*. at 12-13. *Compare* KRS 83A.040(9) (applying to the removal of any elected city officer except in cities of the first class, providing for public removal hearings, and explicitly providing a right to appeal from removal before the circuit court).

[10] In *Arnett*, 2008 WL 4091014, this Court affirmed the mayor's removal based on other grounds without squarely addressing whether unauthorized contractual transactions which occurred during the mayor's prior administration would have been sufficient grounds for removal. *See id*. at *4-5. However, the lower court in *Arnett* seemingly rejected any contention that discussing an issue before the city council without anyone raising an objection amounts to obtaining the city council's approval. After all, the lower court upheld the mayor's removal (which was based partly on the mayor's paying a contractor who had not been awarded a contract by the city

-8-

Weddle stresses the tourism commission asked him to sign the mortgage because mortgaged property (including the park) is owned by the city. He also points to email correspondence in the record in which Weddle asked Robinson (executive director of the tourism commission) to appear before the city council and to explain the project in detail. Having reviewed such correspondence in the record, Weddle's request for Robinson to appear at the meeting was in response to an email from Robinson stating the bank believed the city council's approval was required. Weddle responded to this email about the bank's believing the city council's approval was required by stating he approved and would put the matter on the agenda at the July 7, 2025, meeting.

Having reviewed the recording of the city council meeting held on July 7 of 2025, Robinson did speak briefly about the loan and said that the mayor would need to sign documents because city property was affected. However, as previously noted, a city council member asked whether the loan documents were available for review, and Robinson said he had not brought the documents with him. (The Appellants emphasize the mortgage and loan documents were not provided to them in their initial brief.) Moreover, we note there was no mention during Robinson's presentation to the city council at the July 7 meeting that the

council) despite a city council member's testimony admitting the issue was discussed with the council without objection. *See id.* at *1-2.

-9-

closing on the loan was scheduled for the next day—July 8, 2025 (when the loan documents were executed). Therefore, since they did not have the opportunity to view the loan documents and were not told the closing was set for the following day, perhaps the city council members did not perceive that Weddle was fully transparent or offered full disclosure about the loan at the July 7 meeting.

In any event, whether full disclosure was provided or not, the city council did not vote to approve the mortgage/loan transaction.

**City Council Did Not Vote to Approve the Mortgage/Loan Transaction**

Weddle emphasizes attorneys for both the city council and the City of London were present at the July 7 meeting and that the bank prepared the documents about the loan. He suggests the attorneys assented to the deal, although he does not dispute that no motion was made, or vote taken by the city council. Weddle also contends that if the city council wanted to express disagreement, they should have voiced an objection or called for a vote. He suggests the city council acted unfairly by simply waiting until after he signed the documents to charge him with misconduct and seek to remove him.

Notwithstanding Weddle's contentions, we reject any assertion that the loan transaction was approved by the city council. The minutes of the July 7, 2025, regular city council meeting clearly state that no motion was made, and no vote was taken following Robinson's presentation to the city council. (Moreover,

-10-

this statement about no motion being made and no vote being taken is accurate based on our viewing of the meeting recording.)  So, the city council did not approve the loan or mortgage because no vote was taken as reflected by the minutes.  *See Louisville Civil Service Bd. v. Blair*, 711 S.W.2d 181, 184 (Ky. 1986) ("[B]oth the City and the Civil Service Board speak only through their authorized records.  Such records contemplate only duly authorized and adopted resolutions and ordinances respectively.").  *See also Snowden v. City of Wilmore*, 412 S.W.3d 195, 208 (Ky. App. 2013):

> A city council acts only through its formal records which "constitute the only legal evidence of all that was done and that nothing more was done."  *Louisville & Jefferson County Metropolitan Sewer Dist. v. General Distillers Corp. of Kentucky*, 257 S.W.2d 543, 547 (Ky. 1953).  Thus, it cannot be bound by an implied promise.

Moreover, Weddle's perception that the attorneys present assented to the deal is irrelevant.  *See Snowden*, 412 S.W.3d at 209 ("Regardless of Snowden's inferences or beliefs, Gullette's words, as City Attorney, could not bind the City to take particular action[.]").

In short, the city council did not approve the mortgage/loan transaction before Weddle signed the documents at issue on July 8, 2025.  Now we address the parties' arguments about whether the city council's approval was required by law before Weddle signed the documents.  We conclude it was.

## City Council Approval Was Required by Law Before Weddle Could Properly Execute Loan and Mortgage Documents Binding the City

Appellants assert that a debt was created by Weddle's executing the loan agreement and the mortgage placed on city property to secure the loan. They argue to the extent that such a debt is authorized by Kentucky law, it would be as a bond of the city which must be enacted by ordinance to permit such a debt. *See* KRS 66.011; KRS 66.101.

Appellants also suggest that incurring debt is an inherently legislative function. By analogy, they point out that incurring debt for the Commonwealth is a legislative matter under the Constitution of Kentucky. *See* KY. CONST. § 49 ("The General Assembly may contract debts to meet casual deficits or failures in the revenue . . . .").

In the mayor-city council form of municipal government (as in London), the mayor is the executive authority, and the city council is the legislative authority. KRS 83A.130(3), (11). The mayor's responsibilities include enforcing all applicable statutes, KRS 83A.130(3), and executing bonds, notes, contracts and other written obligations of the city. KRS 83A.130(8).

The city council has the right to investigate city government activities. KRS 83A.130(13). It is also charged with providing, by ordinance, "for sufficient revenue to operate city government and shall appropriate the funds of the city in a

budget which shall provide for the orderly management of city resources." KRS 83A.130(12).

KRS 83A.130 does not explicitly state that incurring municipal debt is a legislative/city council function in the same forthright manner as KY. CONST. § 49 does regarding the General Assembly. Nonetheless, construing the various subsections of KRS 83A.130 together, the mayor cannot properly execute notes, bonds, or contracts on the city's behalf without first obtaining the city council's approval. *See Snowden*, 412 S.W.3d at 206 (noting mayor signs city's notes, bonds, contracts and other written obligations under KRS 83A.130(8) and further stating: "While executive authority is vested in the mayor, KRS 83A.130(3), he does not act alone. Legislative power is vested in a council, KRS 83A.130(11), which adopts ordinances the mayor may sign into law or veto subject to council override. KRS 83A.130(6)."). Terms of a contract to which the city is a party must be approved by a majority of the city council before the contract is signed by the mayor and becomes effective. *Snowden*, 412 S.W.3d at 207.

Moreover, Weddle's actions in signing the mortgage and loan documents affected city resources, including the park. *See* KRS 83A.130(12) ("The council shall by ordinance provide for sufficient revenue to operate city government and shall appropriate the funds of the city in a budget which shall provide for the orderly management of city resources.").

In fact, Appellants assert that Weddle's signing the mortgage and associated loan documents without obtaining the city council's prior approval violated the law because the city council made no appropriations to authorize or fund the mortgage/loan transaction. *See* KRS 91A.030(1), (13). Appellants also suggest the mortgage/loan transaction was illegal because it could potentially cause a budgetary shortfall. *See* KY. CONST. § 157b; *Taylor v. Carter*, 333 S.W.3d 437, 441-43 (Ky. App. 2010). (They also argue the long-term nature of the loan is especially problematic since Kentucky statutes generally permit only short-term debts to be incurred by cities, and even then, only as authorized by legislation. *See* KRS 65.7701, KRS 65.7703; KRS 65.7709.) Appellants also point out the Tourism Commission was not authorized by law to take out the note without the city council's approval pursuant to KRS 91A.390(7)-(8).

Weddle, on the other hand, argues that the city council's approval was not specifically required by state law. He contends Appellants fail to cite any authority which specifically required that he obtain the city council's approval before he executed the documents at issue.

Weddle asserts he did not bind the city to pay any amount of money because the tourism commission agreed to make the loan payments, although he admits the mortgage was secured by city property. *See* KRS 91A.030(13) ("No city agency, or member, director, officer, or employee of a city agency, may bind

the city in any way to any extent beyond the amount of money at that time appropriated for the purpose of the agency.").

Weddle also points out the tourism commission is a special purpose government entity with separate policy-making authority and independent authority to generate public funds, and which may receive and expend public funds. *See* KRS 65A.010(9).[11] *See also generally* KRS 91A.390(2)-(3); KRS 91A.400(3) (restaurant and room tax revenues to be placed in a separate account from other tax revenues and portions of restaurant and room tax revenues can be used to acquire, construct and maintain tourism facilities upon the advice and consent of local tourism commission).

However, local tourism commissions are established by local governing bodies, receive funding from such local governing bodies, and must be included in the local governing bodies' annual budgets. KRS 91A.390(1)(a)-(b) Moreover, the tourism commission was obligated by statute to obtain the city council's approval to borrow money. *See* KRS 91A.390(7) (tourism commission

---

[11] Other subsections of KRS 65A.010 were recently amended; however, KRS 65A.010(9) was not amended. In any event, we refer to the version of KRS 65A.010 in effect at the time of the 2025 removal proceedings and the appeal in circuit court.

may borrow money, "with the approval of the tax levying body" subject to certain stated conditions).[12]

In addition to contending that the tourism commission (not the city) was responsible for making loan payments, Weddle asserts that, despite the mortgaging of city property, it is unlikely that the city would incur any liability from the loan/mortgage transaction. For example, he argues it is unlikely the city would lose the park in the event the tourism commission defaults on its payment obligation[13] because of a clause in the park's deed of conveyance to the city providing that the property will revert to the Commonwealth if the property is no longer used as a public park.

However, even if the tourism commission makes all loan payments and even if it is unlikely that the city would ever lose the park in foreclosure, we agree with Appellants that the mortgage/loan transaction was still a debt impacting the city for which the city council's approval was required before execution of the mortgage and associated loan documents.

---

[12] Local governing bodies, such as the city council here, may adopt legislation imposing taxes on transient rooms and on restaurants to fund tourism commission operations. *See generally* KRS 91A.390; KRS 91A.400.

[13] The tourism commission would perhaps derive funds from room and/or restaurant taxes to make payments on the loan. *See* KRS 91A.390; KRS 91A.400. Such room and restaurant taxes must be passed by local government bodies, however, and tourism commissions must submit requests for funds to such local government bodies. *See* KRS 91A.390(1).

Perhaps the taking out of a loan to be paid out of a special fund or separate revenues[14] might not always be considered a city debt subject to constitutional concerns—especially if there is no mortgage or lien other than one on the revenue/income generated for making loan payments. *See City of Bowling Green v. Kirby*, 220 Ky. 839, 295 S.W. 1004, 1008-09 (1927) (holding loan to build/expand waterworks not a constitutionally prohibited debt to city where payments were to be made from waterworks revenues and there was mortgage/lien on income from waterworks to secure the loan).

Here, however, there was not simply a lien on revenues from the property for which funds were sought for improvement (the fairgrounds)—instead, the transaction at issue involved mortgaging separate valuable real property owned by the city (the park).[15]

City property, including the park, was pledged as collateral to secure a loan for five million dollars to refurbish the fairgrounds. This clearly imposed a risk that valuable city property could be forfeited, or that the city might incur

---

[14] In his presentation to the city council, Robinson indicated that the tourism commission would use restaurant tax revenues to pay off the loan and that insurance proceeds would be used to pay some of the costs of rebuilding the fairgrounds.

[15] The 2019 deed conveying the park to the city states the park consists of several hundred acres of land with various improvements, with a collective fair-market value of thirteen million dollars at that time.

expenses in defending against such forfeiture,[16] if the tourism commission

defaulted on its payment obligation.  The mortgaging of city property which did

not directly benefit from the loan (the park) is a debt impacting the city,[17] and we

conclude the city council's prior approval was required by Kentucky law.

We reject Weddle's assertion that there was simply a disagreement

about whether the city council's approval was necessary—an insufficient basis for

removal in his estimation.[18]  Kentucky law clearly required the city council's

approval before Weddle executed the mortgage and loan agreement.

---

[16] As Appellants point out, precedent indicates that reversionary clauses may not always be enforced in the event of foreclosure.  *See generally Murray Hospital Ass'n v. Mason*, 306 Ky. 248, 206 S.W.2d 936 (1947); *Coomes v. Frey*, 141 Ky. 740, 133 S.W. 758 (1911).

[17] *See Kirby*, 295 S.W. at 1007, discussing the reasoning of out-of-state precedent:

> the mortgagee was given the right to foreclose its mortgage against property belonging to the city, and because of that fact it was held that the city might be compelled to pay the debt by surrendering property which belonged to it, and for that reason it was the debt of the city, as much so as if there might have been a remedy by compelling the city to pay the debt with money collected by taxation. Indeed there could be no great difference.  In one case the city would be compelled to pay with its property and in the other it would be compelled to pay with the money obtained through taxation.  If the property which would have to be used to pay the debt had previously been obtained by taxation, it would be a payment of the debt by the municipality.  Such an indebtedness is an indebtedness of the municipality within the meaning of constitutional provisions prohibiting indebtedness beyond a certain sum.

[18] Weddle asserts government officials are afforded protection "for good faith judgment calls made in a legally uncertain environment."  Appellee brief, page 18 n.82 (quoting *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006)).  However, *Sloas* did not involve proceedings to remove an elected city official from office for alleged misconduct or willful neglect.  Instead, *Sloas* concerned whether individual county officials could be held individually liable on tort claims or must be afforded qualified official immunity.  *See id*. at 473-76.

In sum, Weddle signed the mortgage and loan documents without obtaining the city council's prior approval as required by Kentucky law.

Next, we address the parties' arguments about whether Weddle's execution of the documents without the required approval of the city council was sufficient to support a finding of misconduct or willful neglect pursuant to KRS 83A.040(9). We conclude it was.

**Weddle's Signing the Mortgage and Loan Documents Without Obtaining Prior City Council Approval was Sufficient to Support the Finding of Misconduct or Willful Neglect**

Appellants point out that Weddle admitted in his testimony that: "generally, when signing any documents with the banks, we have to have minutes of the meeting or resolution. I had neither in my hand, but I proceeded on at that point." (Transcript of 9/5/2025 public meeting, page 91.)

Appellants contend Weddle knew approval was required but declined to ask for a vote because he feared the city council would oppose the loan transaction. They also point out that the loan agreement, mortgage, and assignment of rents and leases[19] signed by Weddle all contained warranties and/or representations about the transaction being duly authorized. (The loan agreement

---

[19] Despite any statements to the contrary in Appellants' briefs, the promissory note was not signed by Weddle. The tourism commission and the bank were the sole listed parties to the promissory note. The promissory note did contain a representation that the tourism commission (and/or its representative signing the note) had the right and authority to enter into the note.

also contained representations that the loan agreement and mortgage were duly authorized by all necessary action and will not violate the law. Moreover, the assignment of rents and leases also contained representations that all necessary governmental approval had been obtained and that the assignment would not violate the law.)

Appellants assert Weddle engaged in misconduct by committing fraud against the bank as well as violating statutes in executing the documents without obtaining the city council's approval of the mortgage/loan transaction.

They admit the term *misconduct* is not defined in KRS 83A.040, but argue precedent indicates this term should be construed broadly to include violations of statute and financial irregularities. *See generally Jenkins*, 285 Ky. 240; *Ball*, 847 S.W.2d 743; *Rawlings*, 275 Ky. 183.

On the other hand, Weddle submits that perhaps the mortgage/loan transaction was void due to his failure to obtain city council approval before signing the documents. *See generally Snowden*, 412 S.W.3d at 206-07. But he argues that his executing documents in a void transaction does not harm the city and should not be considered misconduct or willful neglect on his part.

However, as Appellants point out, longstanding precedent holds that misconduct relating to financial irregularities may be properly found to support

removal of government officers despite any lack of actual financial harm to a municipality. *Jenkins*, 147 S.W.2d at 398.

Even if perhaps some minor violations of statutes or minor departures from best financial management practices might not always amount to sufficient misconduct or willful neglect to support removal, Weddle's undisputably executing documents mortgaging city property to secure a long-term multi-million-dollar loan without obtaining city council approval beforehand supports the city council's finding of misconduct or willful neglect. This unauthorized action created a risk that valuable city property, enjoyed by the citizens of London and the general public, would be forfeited or that significant taxpayer-funded resources must be utilized to defend against any such forfeiture for a period of approximately thirty years. This was not a *de minimis* failure to observe procedural niceties nor an insignificant commitment of city resources.

The circuit court erred in determining there were no sufficient grounds to remove the mayor from office and therefore erred in overturning the removal and reinstating Weddle.

Moreover, Weddle's execution of the mortgage, assignment, and loan document without obtaining prior city council approval was, by itself, sufficient grounds for removal for misconduct and/or willful neglect. Thus, we decline to discuss or opine upon the other bases for removal found by the city council.

Further arguments raised by the parties in their appellate briefs have been determined to lack merit or relevancy to our resolution of this appeal.

## CONCLUSION

For the foregoing reasons, we REVERSE the circuit court's judgment, VACATE Weddle's reinstatement, and REMAND with directions to enter an order affirming the city council's removal of Weddle from office.


ALL CONCUR.


BRIEFS FOR APPELLANTS:

Christopher Wiest
Theodore Roberts
Covington, Kentucky

BRIEF FOR APPELLEE:

Carmine G. Iaccarino
Lexington, Kentucky